## APPEAL OF HEDWALL-SUNDBERG CO.

Docket No. 459. Promulgated February 19, 1927.

> Corporation conducting business as general agents for fire and hail insurance companies and performing a substantial portion of its functions through others than the principal stockholders, *held,* not to be entitled to personal service classification.

*W. Yale Smiley, Esq., Monte Appel, Esq.,* and *Carl A. Heisterman, Esq.,* for the petitioner.
*J. Arthur Adams, Esq.,* for the Commissioner.

### FINDINGS OF FACT.

On January 1, 1914, Charles J. Hedwall and Harry A. Sundberg entered into an agreement of partnership to do business under the name and style of the Hedwall-Sundberg Co. The purpose of the partnership was the conduct of a general insurance agency in Minneapolis, Minn.

At the time of the formation of the partnership, both Hedwall and Sundberg were experienced insurance men. They had been continuously engaged in the insurance business in Minnesota and adjacent States for twenty-six years and fifteen years, respectively, and knew the business and the territory intimately.

On January 15, 1914, Hedwall and Sundberg signed a contract with Svea Fire & Life Insurance Co. to represent that company as its general agents for the State of Minnesota. This was superseded

by a contract dated January 1, 1917, the material portions of which are as follows:

THIS AGREEMENT made and entered into this 1st day of January 1917, by and between the SVEA FIRE AND LIFE INSURANCE COMPANY, LIMITED, of GOTHENBURG, SWEDEN, party of the first part, and Charles J. Hedwall and Harry A. Sundberg, of Minneapolis, Minn., (doing business under the name of THE HEDWALL-SUNDBERG COMPANY) party of the Second Part, WITNESSETH:

FIRST:—That in consideration of the fulfillment of the mutual agreements herein made, the party of the first part appoints the party of the second part its GENERAL AGENTS for the States of Minnesota, Wisconsin, Iowa, North Dakota, South Dakota and Kansas, with full power and authority to appoint and remove agents in said State, to accept service of process for the SVEA FIRE AND LIFE INSURANCE COMPANY, LIMITED, to adjust losses under the policies of said Company, to receive and acknowledge service of Proofs of Loss, to issue, countersign and cancel its policies and to receive and receipt for premiums thereon and generally to conduct the business of said Company in the territory above-mentioned in accordance with such instructions and directions as they may from time to time receive from the said Company.

SECOND:—That the local agents in the said territory shall report their business to the said GENERAL AGENTS, and the party of the second part hereby agrees to forward promptly to the Home Office of the party of the first part, copies of reports of risks written and of endorsements made as may be received by them from the agents in said territory, also to promptly report all policies written in the office of the party of the second part and endorsements made on such policies by them; also to report promptly to the party of the first part all appointments, removals and changes of agents, and to furnish other information which said party of the first part may desire in connection with said business. The party of the first part reserves the right to reject and cancel any business sent in that is not entirely satisfactory to it.

THIRD:—That the said party of the second part shall forward not later than the Fifteenth (15th) of each month a monthly report or statement of account for the preceding month, of all business done for the party of the first part by said party of the second part, as well as through all the authorized agents in the territory named, and shall forward to said party of the first part the balances shown by such statements within seventy-five (75) days after the close of the month for which said account was made up, and the said party of the second part does hereby agree to assume and does assume the responsibility to said party of the first part for the premiums written by them or by the agents in said territory. It is agreed that policies cancelled for non-payment of premiums are to be returned to the party of the first part as uncollectible within Ninety (90) days after the month in which they are issued. Otherwise the said party of the first part is to be credited with the earned premiums for the full period from the date of issue to the date of cancellation. It is understood that on all cancellations and reinsurance effected on business written under this Agreement there shall be returned to the said Company the same percentage of commission, inclusive of overriding commission, as was allowed on the original transactions.

FOURTH:—The said party of the second part shall forward to said party of the first part a satisfactory Bond in the sum of Ten Thousand ($10,000) Dollars conditioned upon the satisfactory discharge of their indebtedness to the said party of the first part and the faithful performance of their obligations under this contract.

FIFTH :—The party of the second part shall advise the party of the first part of all losses immediately after they have received advices of same, and the party of the second part is hereby authorized to provide for the adjustment of the losses, the losses when adjusted to be paid in the manner directed by the party of the first part. It is, however, understood and agreed that in event of differences arising in the adjustment of any .loss, or in case of threatened litigation arising in connection with any claim, the party of the second part will immediately and fully communicate all the facts to the party of the first part, so that the party of the first part may have full information and advise the party of the second part of its wishes in the matter.

SIXTH :—Said party of the first part agrees to pay the party of the second part an overriding commission of Ten (10%) per cent. on the net premiums written, meaning thereby the gross premiums less return premiums and reinsurances placed through the said General Agents, or effected in the office of the party of the first part. The said commission of Ten (10%) per cent. shall be in full for all costs of the business to the party of the first part, excepting commissions paid to local agents, taxes, fees and licenses—both State and Municipal, adjustment expenses paid by the party of the second part to parties not connected with their office, (except such losses as in their judgment the Company's interest will be best served by their personal adjustment), legal expenses in resisting losses, expressage and legal advertising, local board and fire patrol assessments, and the party of the first part further agrees to furnish, for the use of the agents in said territory, policy blanks, policy registers, daily reports, endorsement blanks and the usual and necessary agency supplies.

SEVENTH :—It is understood and agreed that on the business ceded to the Treaty Company and to the Reinsurance Bureau the party of the second part shall only be allowed a commission of Twenty-five (25%) per cent. flat, inclusive of local agents commissions and overriding commissions.

EIGHTH :—The said party of the first part further agrees to pay said party of the second part a further compensation of Ten (10%) per cent., on the net profits earned on the business transacted, the net profits to be determined by a calculation on the following basis : * * *.

NINTH :—This contract may be terminated at any time by either party giving sixty (60) days' notice in writing to the other, at the expiration of which time this Contract shall cease and terminate, and in case of either so doing neither shall have any claim upon the other for loss of prospective profits, commissions, or damage to business arising therefrom, and the duties of each party to the other shall continue in full force and effect until the termination of said sixty (60) days, unless otherwise mutually agreed.

IT IS FURTHER UNDERSTOOD AND AGREED that upon the termination of this Contract no charges shall be made by the said party of the second part for services in the settlement of their account or winding up the affairs of the business of the said party of the first part and said party of the second part.

IN WITNESS WHEREOF, the said SVEA FIRE AND LIFE INSURANCE COMPANY, LIMITED, of GOTHENBURG, SWEDEN, and CHARLES J. HEDWALL and HARRY A. SUNDBERG, of MINNEAPOLIS, MINN., (doing business as The Hedwall-Sundberg Company) have affixed their signatures to this AGREEMENT the day and year first above written.

SVEA FIRE & LIFE INSURANCE CO., LTD.

(Signed)    J. M. WENNSTROM, *Manager*.

THE HEDWALL-SUNBERG CO., GENL. AGENTS.

(Signed)    CHAS. J. HEDWALL.

(Signed)    HARRY A. SUNDBERG.

Witness: George C. Hale.

Witness: F. Harlin.

In April, 1914, Hedwall and Sundberg formed the Hedwall-Sundberg Co., a Minnesota corporation, the appellant before us. All the authorized stock was issued to Hedwall and Sundberg in the same proportion as their interests in the partnership, i. e., two-thirds to Hedwall and one-third to Sundberg.

Subsequently, in the years prior to 1918, Hedwall and Sundberg signed other contracts with other insurance companies to represent such companies as general agents in Minnesota and adjacent States, the material portions of which are as follows:

THIS MEMORANDUM OF AGREEMENT, made and entered into this ninth day of December, A. D. 1915, by and between the Providence Washington Insurance Company, a corporation duly chartered by the General Assembly of the State of Rhode Island, and located and doing business in Providence in said State, hereinafter called the COMPANY, and Charles J. Hedwall and Harry A. Sundberg, of Minneapolis, Minnesota, doing business as the Hedwall-Sundberg Company, hereinafter called the GENERAL AGENTS.

WITNESSETH, That whereas the said COMPANY is desirous of appointing the Hedwall-Sundberg Company, and hereby does appoint them, its GENERAL AGENTS for the management of its Hail Insurance Business in the States of Minnesota, North Dakota, South Dakota, Nebraska, Montana, Kansas, Iowa, Colorado, Texas and Wyoming, in accordance with its Rules, Regulations and Instructions, and

WHEREAS, said GENERAL AGENTS are desirous of accepting, and hereby do accept said position, subject to said Rules, Regulations and Instructions of the COMPANY.

Now, THEREFORE, in consideration of the premises, of the mutual covenants and agreements hereinafter contained, and of One Dollar paid by each party hereto to the other (the receipt whereof is hereby acknowledged), it is mutually agreed by and between the parties hereto, as follows, namely:

First—COMPANY'S OBLIGATIONS. The said COMPANY hereby agrees to provide all necessary Hail policy blanks and to pay for the printing of applications, loss notices, proofs of loss and other Company supplies necessary to the conduct of the Hail Insurance Business, and authorizes the said GENERAL AGENTS to have said printing done in Minneapolis, Minnesota, and to charge the bills therefor in their monthly accounts, furnishing proper vouchers therefor.

It also agrees to pay all taxes, agency licenses and Insurance Department fees, postage at a rate of not exceeding four cents (4¢) per policy, express and Parcel Post charges incurred in shipping supplies to agents.

It will also furnish drafts for the payment of all losses incurred under this contract, and it hereby authorizes the GENERAL AGENTS to issue drafts in payment of such losses upon the Home Office of the Company at Providence, R. I.

It hereby agrees to allow the GENERAL AGENTS Thirty-Two and one-half per cent. (32½%) on the net premiums on the Hail business written through them; and in addition thereto it will pay a contingent commission of ten per cent. (10%) on the net profits of the business covered by this contract, which net profit shall be determined as follows:

*        *        *        *        *        *        *

The term "Net Premiums," wherever used in this contract, means the gross premiums written by and through the GENERAL AGENTS, less all return premiums, rebates, and premiums paid or charged on reinsurance policies.

Second—GENERAL AGENTS' DUTIES. The GENERAL AGENTS hereby agree upon the foregoing terms to supervise the Hail business of the COMPANY in the territory named after this date, and to devote their time, skill and energies thereto, and to establish agencies in said territory; to adjust, or cause to be adjusted, all losses that may occur, and to faithfully perform all other duties of General Agents under the direction of the Executive Officers of the Company, subject in all cases to such instructions as may be given to them from time to time; that they will compensate their local agents out of their commissions which the COMPANY has hereinbefore agreed to pay them, and that they will pay for all necessary, special and adjusting work, in order that the business may be handled properly and the best results obtained; that they shall appoint the now duly authorized fire agents of the COMPANY as their agents to accept applications for Hail insurance, with the proviso, however, that, should the GENERAL AGENTS desire to appoint additional agents for said purpose, they are authorized to do so.

They agree to forward to the Home Office of the COMPANY a weekly statement of all agents appointed and policies issued, showing policy numbers, names of assured, amount of liability, amount of premiums, locations of agency and of risk, and a similar record of all policies cancelled, returned and not taken.

The said GENERAL AGENTS agree to be personally responsible to the COMPANY for the payments of all premiums on policies issued by or through them, and to remit the balance due the COMPANY as shown by their final account, made in accordance with the provisions of this contract each season not later than November 15th of each year, said final account to be forwarded on or before November 1st of each year.

All other expenses connected with the business not specifically enumerated herein as chargeable to the COMPANY, shall be borne by the GENERAL AGENTS; but nothing herein shall render them liable for any losses incurred under the policies issued by them, or for any litigation expenses incurred in contesting losses, all of which are to be paid by the COMPANY, but no such expenses of litigation are to be incurred without the approval of the COMPANY.

The GENERAL AGENTS agree to comply with all State Laws in conducting the business, so as not to render the COMPANY liable for any penalty.

They also agree to furnish original notice of loss attached to each proof of loss, together with advice of issuance of loss draft in payment of claim not later than the date on which the draft is issued.

On the 15th day of each month they shall forward a statement to the COMPANY showing the actual cash remittances received in payment of premiums during the preceding calendar month, and the proceeds of notes and certificates of deposit maturing and collected during the preceding month, and shall accompany same by a remittance of the net amount due the COMPANY.

Should the COMPANY at any time request it, the GENERAL AGENTS agree to send to its Home Office any portion of or all certificates of deposit and notes received in payment of premiums for Hail insurance in their possession, properly endorsed to the COMPANY, it being understood that said certificates of deposit and notes are at all times the property of the COMPANY until the GENERAL AGENTS settle the balance due the COMPANY at the end of each season, when they become the property of said GENERAL AGENTS.

The GENERAL AGENTS agree to give the COMPANY a fidelity bond in the sum of Ten Thousand Dollars ($10,000) guaranteeing the just and prompt payment of all moneys due to the COMPANY upon any business done in said territory by the GENERAL AGENTS, in the usual form.

This AGREEMENT shall continue in force, from year to year, until cancelled by either party giving the other sixty (60) days' written notice of its intention to discontinue same, but no such notice shall take effect until the end of any season and until all the obligations under the contract pertaining to said season have been fulfilled.

In TESTIMONY WHEREOF, the said Company and Charles J. Hedwall and Harry A. Sundberg, the members of the firm of General Agents, have hereunto set their names, and caused their seals to be affixed, this tenth day of December, A. D. 1915.

PROVIDENCE WASHINGTON INSURANCE COMPANY.

(Signed)        C. D. DUNLAP,

*Vice President.*

Signed, Sealed and Delivered in presence of:

(Signed)        CHAS. J. HEDWALL.

(Signed)        HARRY A. SUNDBERG.

(Signed)        L. N. DAVIS.

---

THIS AGREEMENT made by and between the WESTCHESTER FIRE INSURANCE COMPANY of New York on the one part, hereinafter referred to as the "Company", and CHARLES J. HEDWALL and HARRY A. SUNDBERG, doing business as The Hedwall-Sundberg Company, of Minneapolis, Minn., on the other part, hereinafter called the "General Agents".

WITNESSETH: That the Westchester Fire Insurance Company appoints and constitutes the Hedwall-Sundberg Company as its sole General Agents for the conduct of its Hail Insurance business in the States of Minnesota, North Dakota, South Dakota, Nebraska, Montana, Kansas, Oklahoma, Iowa, Colorado, Texas and Wyoming, with full power and authority to issue policies of Hail Insurance, and, as to this department only, to appoint and remove agents, to fix rates of premiums subject to the approval of the Company, to collect premiums, adjust losses, and, as General Agents, to act within said States as its representatives subject to the following conditions:

1. The General Agents specifically assume all responsibility for full compliance with the laws of the various States in which they operate; and, for the faithful performance of their duties and the execution of this contract, agree to furnish for the benefit of the Company a Fidelity Bond in a Surety Company satisfactory to the latter in the amount of $50,000.

2. The General Agents agree that in appointing agents to accept applications for hail insurance, they will give preference to the duly authorized fire agents of the Company, to the end that the Hail Department may be conducted as a supporting adjunct to the Company's fire insurance business and not to the detriment thereof. It is, however, understood and agreed that the General Agents shall, if they so desire, be permitted, and they are hereby authorized to appoint other and additional agents for hail business.

3. The General Agents shall, during the hail writing season, forward to the office of the Western Department of the Company at Chicago, Ill., a weekly statement of all policies issued by them or by agents appointed by them, showing policy numbers, names of assureds, amount of liability, amount of premiums, location of agency, location of risk, and a similar record of all policies cancelled, returned and not taken.

4. The General Agents shall be personally responsible to the Company for the payment of all premiums on policies issued by them or by their agents, and in consideration of the compensation hereinafter mentioned, to assume and

pay all expenses of supervision and inspection, office rent, office salaries, advertising, and all other expenses connected with the operation of the General Agency, including special agents' salaries and traveling expenses, and loss and adjustment expenses, except that no loss expenses for litigation are to be paid by the General Agents, and no such expenses of litigation are to be incurred by them except with the approval of the Company.

5. The Company agrees to furnish policy blanks and to pay for the printing of applications, loss notices, proofs of loss, and other Company supplies necessary to the conduct of hail insurance, said printing to be left in the hands of the General Agents but proper vouchers for these expenses shall be furnished to the Company.

6. The Company also agrees to pay for all taxes, agency licenses and Insurance Department fees, and postage, not to exceed 4¢ per policy, and express and parcel post charges incidental to shipping supplies to agents.

7. The Company agrees to furnish the General Agents with drafts for payment of all hail losses, and authorizes the General Agents to issue drafts in payment of losses upon its Western Department Office at Chicago, Ill.

8. The General Agents agree to forward the original notice of loss attached to proof of loss, together with advice of issuance of loss draft in payment of claim not later than the date on which the draft is issued.

9. The General Agents shall forward to the Western Department Office of the Company at Chicago, Ill. on the 15th day of each month, a statement showing the actual cash remittances received in payment of premiums during the preceding calendar month and the proceeds of notes and certificates of deposits maturing and collected during the preceding calendar month, and shall at the same time remit to said Company the amount of such premiums and proceeds received, less commission as hereafter established and such other expenses incurred during the said month as are chargeable to the Company under this contract.

10. The General Agents agree to forward at the request of the Company such certificates of deposit received in payment of premiums for hail insurance in their possession under the operations of this contract as are available and not necessary to further the production of business by the General Agents.

11. A final account on which the contingent of the business of the current year is to be figured, shall be rendered not later than November 1st of each year, and the final balance due the Company shall be paid not later than November 15th of each year.

12. The Company shall make an allowance to the General Agents of Twenty-seven and one-half Percent (27½%) commission on the net premiums on the business coming within the scope of this agreement, (i. e., gross premiums less cancellations and returns, and less also all reinsurance effected), and a further allowance of Ten Percent (10%) contingent commission on the annual net profits which shall be calculated as follows:

*       *       *       *       *       *       *

14. This agreement is made for one year from December 1st 1917 but in consideration of compliance with the terms thereof by both contracting parties, shall thereafter continue in force from year to year by mutual consent. It is especially provided, however, that this agreement may be terminated in its entirety as of December 1st, in any year or modified as to the territory included within its scope by either party upon notice in writing to the other party, provided such written notice is given on or before December 1st of the same year.

15. This agreement supersedes and replaces all previous agreements or addenda between the contracting parties and relating to the subject hereof.

WESTCHESTER FIRE INSURANCE COMPANY OF NEW YORK.

| | By (Signed) | SIGFRIED SCHWARZ, *Manager.* |
| | (Signed) | CHAS. J. HEDWALL. |
| | (Signed) | HARRY A. SUNDBERG. |

WITNESSES:

(Signed)      EDWIN WERNER.

JULIA CARLSON.

F. HARLIN.

### GENERAL AGENCY AGREEMENT.

THIS AGREEMENT, made this ———— day of ———— A. D. 1917, by and between the Columbian National Fire Insurance Company, of Detroit, Michigan, party of the first part, and Charles J. Hedwall and Harry A. Sundberg, doing business as The Hedwall-Sundberg Company, of Minneapolis, Minnesota, party of the second part.

WITNESSETH: that the said parties, in consideration of the mutual covenants and agreements hereinafter mentioned, hereby mutually agree with each other as follows:—

That the said party of the first part does hereby appoint said party of the second part as representative, with the title of General Agent, for the purpose of appointing agents, collecting premiums, making inspections, attending to settlement of losses, if any, and performing such other duties as are usually required of a General Agent. This appointment being made on the following terms and conditions:—

FIRST: The territory allotted to the said The Hedwall-Sundberg Company is the States of Minnesota and Kansas, and such other States as may from time to time be allotted to them.

SECOND: The compensation for such services as General Agent shall be as follows: Thirty (30%) percent commission upon the net premiums written by all the agents in the States of Minnesota and Kansas and other States, if any, covered by this contract (net premiums being the gross premiums written, less return premiums, rebates and premiums on re-insurance, if any, effected by the said The Hedwall-Sundberg Company, General Agent.)

THIRD: In addition to the said Thirty (30%) per cent commission, a Contingent Commission of Ten (10%) percent to be determined as follows:

&ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;

FOURTH: The first Contingent year shall date from the time this Agreement takes effect, viz: April First, 1917.

FIFTH: The party of the first part to pay all adjustment expenses, state and other taxes, if any, a fire insurance company is subject to in the territory mentioned; postage, agents' licenses, furnish all agency supplies and such advertising matter as shall be determined by said party of the first part. Also rating bureau and patrol expense.

SIXTH: The party of the second part shall fix and pay commissions to all agents licensed and commissioned by said party of the first part in territory covered by this contract.

SEVENTH: All agents of record to mail Daily Reports of policies written or binders issued, direct to the party of the second part at Minneapolis, Minnesota, who will make copy of same for their record, forwarding the original

Daily Report or binder (as issued by agent) promptly to the party of the first part at Detroit, Michigan, with notation as to acceptance or declination.

Also monthly accounts current, endorsements and cancellations to be mailed direct to party of the second part, who after making copy or record, will promptly forward to party of the first part.

EIGHTH: The party of the first part reserves the right to accept or cancel any risks so reported.

Cancellations, if any, by the party of the first part to be made through the party of the second part, who hereby agrees to use due diligence in securing prompt return of such cancelled policies.

NINTH: All losses sustained shall be paid by draft from the office of the party of the second part. Such loss drafts having been preceded by a satisfactory proof of loss and notice to said party of the first part of the making of such drafts.

TENTH: Monthly accounts current to be rendered promptly at the close of each month's business, and remittances to be made in payment of same to the party of the first part within Seventy-five (75) days from the close of each month's business.

ELEVENTH: All re-insurance of Liability accepted by party of the first part to be determined and effected by said party of the first part. Except when party of second part may be specifically authorized to effect re-insurance, in which case the premium on such re-insurance will be treated in computing Contingent Commission as a return premium. Commission on re-insurance effected by the party of the second part to be Thirty (30%) percent.

TWELFTH: The party of the second part hereby guarantees the payment of all premiums upon policies issued by them or other agents in the States of Minnesota and Kansas, or other states covered by this contract, if any, and further agrees to furnish the party of the first part with a good and sufficient personal Bond in the sum of Ten Thousand ($10,000) Dollars, guaranteeing the faithful performance of each and every provision and stipulation of this Agreement, and the payment of all premiums on accounts due or to become due, and the satisfactory accounting for all property sent to the said party of the second part during the life of this Agreement.

THIRTEENTH: This Agreement may be terminated at any time by either party giving Thirty (30) days notice of such intention. Such notice to be delivered either in person or by registered mail.

FOURTEENTH: In case the termination of this Agreement by either party before the completion of a year's business, the above Contingent Commission shall become void and of no effect.

IN WITNESS WHEREOF, The parties to this Agreement have hereunto subscribed the same.

THE COLUMBIAN NATIONAL FIRE INSURANCE COMPANY.

(Signed)     H. P. ORR,
*Secretary-Treasurer.*

DETROIT, MICHIGAN.
Dated: ———, 1917.

(Signed)     CHAS. J. HEDWALL,
(Signed)     HARRY A. SUNDBERG,
*Doing business as The Hedwall-Sundberg Co.,*
*General Agents.*

Dated: Apr. 1st, 1917.

The contract with the Providence Washington Insurance Co. was modified on November 4, 1917, to reduce the allowance of 32½ per

79705°—28——15

cent on the net premiums on hail business to 27½ per cent and to increase the bond to $25,000. The contract with the Westchester Fire Insurance Co. of New York superseded and replaced a similar agreement dated October 7, 1915.

All such contracts were signed by Hedwall and Sundberg, individually. Pursuant to the provisions of these contracts, fidelity bonds were secured and delivered by Hedwall and Sundberg to the insurance companies, guaranteeing the fidelity of Hedwall and Sundberg, individually.

None of the contracts entered into with insurance companies by Hedwall and Sundberg, individually, was ever assigned to the corporation. The corporation had no license to act as an insurance agent. The State of Minnesota did not issue such certificates to corporations. Licenses were issued by the proper state authorities to Hedwall and Sundberg, individually.

Sundberg devoted all his time to the business of the companies represented and Hedwall devoted the greater portion of his time to such business. The companies represented by them as general agents wrote fire, cyclone and tornado insurance, and hail insurance on growing crops. Neither Hedwall nor Sundberg, individually, nor the corporation, ever wrote any insurance policies. All policies were written by local agents of the companies.

A part of the duties of the general agents was to secure local agents to write business. When Hedwall and Sundberg became general agents for the insurance companies, these companies had local agents. They continued as local agents of the insurance companies after Hedwall and Sundberg became general agents for the territory in which they operated. Hedwall and Sundberg recommended others to the insurance companies for appointment as local agents. Applications to the proper state authorities for the issuance of licenses to the local agents were made in the name of the insurance companies, who paid the requisite license fees. The insurance companies issued to the local agents certificates of authority which required the countersignature of the general agents. They also furnished all supplies to the local agents. Hedwall and Sundberg had no authority to revoke the licenses of local agents; such authority was vested exclusively in the insurance companies. Part of the territory within their jurisdiction was later taken away from Hedwall and Sundberg in 1917 or 1918, and the local agents in such territory continued as the agents of the insurance companies, making their reports direct to the companies and no longer reporting to Hedwall and Sundberg.

The general agents had four principal duties. The first of these was to secure satisfactory local agents to write insurance in the companies they represented; the second was to pass upon the risk involved, either accepting or rejecting the insurance and securing

reinsurance when deemed advisable; the third was to attend to collections from the local agents and the remittances to the insurance companies, and the fourth was to adjust hail losses. It was the duty of the local agent to forward each day to Hedwall and Sundberg a report of all policies written by him, giving the details of the insurance written and the property covered. It was the duty of Hedwall and Sundberg either to accept or reject the risk. In case of rejection, the local agent was notified by telegraph to cancel the policy, which notification was subsequently confirmed by letter. They accepted some risks and rejected others. The decisions of the general agents on acceptance or rejection of risks are generally final, although occasionally they are reviewed by the insurance companies. In passing upon the risk for fire business they investigated the moral hazard and the financial responsibility of the assured, using avenues of information which it was their duty to open up and maintain. In passing upon the physical hazard they mapped the business, taking into account such factors as the area of the building, its construction, its occupancy, the exposure, the public fire protection provided by the municipality in which the building was located, other similar risks in the same territory, etc. In passing upon the risk in hail business, which is a very hazardous business and which furnishes about 80 per cent of their income, they passed upon the moral hazard and the financial responsibility of the assured, using avenues of information which it was their duty to open up and maintain. In passing upon the physical risk in the hail business they took into account the susceptibility to hail of the particular locality, the character of the crops to be insured, and other similar factors necessitating a wide experience in the business and an accurate knowledge of the territory. It was their duty to use their judgment and discretion to see that the risk as to all classes of business was properly diversified as to character and locality. It was also their duty, when the risk was acceptable but the amount of insurance written by the local agent was too large in a certain territory or on a certain building or crops, to secure reinsurance of all or a part of such risk, according to their judgment. Neither Hedwall nor Sundberg ever wrote any insurance or performed any of the duties of the local agents.

In considering the appointment of general agents, the insurance companies consider the personal abilities, integrity and knowledge of the prospects. They make no requirement as to the financial standing of such an agent. They require satisfactory bond for the faithful performance of the duties of the agents, including remittance to the company of all premiums collected.

The premiums paid to local agents of different insurance companies are in all cases the same. It was the duty of the general agents to call upon the local agents for the purpose of retaining their

good will and endeavoring to influence these agents to write policies in the companies which the general agents represented. Both Hedwall and Sundberg were known to many of the local agents and during the taxable year a portion of this duty was performed by Hedwall and Sundberg. There were also employed several men, known as special agents, whose duty it was to call upon the local agents for this purpose and also to instruct them as to the correct methods of completing applications and the correct forms of remittance. Only one such agent gave all of his time to the work and the rest worked only a portion of each year. In some instances these special agents were sent to interview prospective local agents.

In addition to making daily reports of the insurance written, it was the duty of the local agents at the end of each month to prepare and forward an account current, which showed, among other things, the amount to be remitted by the local agent after deducting his commissions. The local agents were required to make remittances within forty-five days after the end of each month for the insurance written during such month. At the end of each month it was the duty of the general agents to prepare and forward to the insurance companies a similar account current, showing the business written in the territory by all of the local agents. The general agents were allowed seventy-five days within which to remit the net premiums to the insurance company. In the case of applications for hail insurance, however, the application for insurance was required to be accompanied by a remittance of the premium, which remittance might take either of three forms: (1) check or draft for the premium, (2) notes signed by the assured and endorsed by the local agent, which were made payable to the insurance company, or (3) bank certificates of deposit. In the case of payment by note or certificate of deposit, the payment was retained by the general agent until the due date, generally October 1 of each year, when they would be collected by the general agent and remitted to the insurance companies.

Remittances were due from the local agents, as set out above, thirty days prior to the date when remittances were required to be made to the insurance companies. Because of this the general agents usually had on hand during the taxable year from $8,000 to $10,000 per month of fire insurance premiums received from the local agents but not yet remitted to the insurance companies, and during eight or nine months of the year from $50,000 to $100,000 of such premiums upon hail insurance received but not yet remitted.

The premiums upon hail insurance were required to be remitted with the application for insurance. In the case of fire insurance, if payment was not made within from forty-five to seventy-five days after the close of the month in which the insurance was written, it

was customary to cancel the policy. In such circumstances, if the premium could not be collected, the facts were reported to the insurance company which usually allowed a cancellation of the policy with full credit to the local and general agents of the premium.

The business was started in 1914 without capital and no capital was ever contributed to the business by anyone. It was the policy to distribute all the earnings at the end of each year.

During the taxable year the Charles J. Hedwall Co., a corporation in which Hedwall owned practically all of the stock, was indebted to the taxpayer in sums ranging from $40,000 at the beginning of the year to $72,000 at the close of the year. Hedwall was at all times indebted to the Charles J. Hedwall Co. for sums in excess of the indebtedness of that company to the taxpayer. To make such loans, the taxpayer borrowed money at its bank, ranging from $33,000 at the beginning of the year to $48,000 at the close of the year. These loans were evidenced by promissory notes of the taxpayer endorsed by Hedwall and secured by collateral furnished by him. Hedwall was a director in the bank and for that reason was unable to borrow money in person, and the arrangement outlined above was primarily for the purpose of permitting Hedwall to secure money for investment in various real estate projects.

The gross premiums during 1918 payable by the several assureds amounted to $1,063,922.54. The gross commissions paid by the hail insurance companies were $239,303.99, and the commissions paid by the fire insurance companies were $55,054.37. The total gross commissions paid for insurance were $294,358.54, of which $166,751.99 was the amount payable to local agents and $127,606.35 was retained and reported by the taxpayer.

The expenses of the year were as follows:

| | |
|---|---|
| Office salaries | $11,385.29 |
| Field salaries | 6,193.46 |
| Office expense | 3,027.07 |
| Field expense | 29,414.52 |
| General expense | 4,691.98 |
| Hail adjustment expense | 19,509.71 |
| Total | 74,222.03 |

The office salaries represent payments to clerical employees, including bookkeepers and an auditor. The item of field salaries represents the amount paid to the special agents referred to above. The item of field expense represents the expenses of such special agents and expenses of the officers of the corporation while traveling. The item of hail adjustment expense represents the cost of 2,787 adjustments of claims for loss under hail insurance policies at $7 each. During the taxable year all such losses were adjusted by the Western

Adjustment & Inspection Co. upon the basis of a flat rate of $7 for each claim so adjusted. Under the terms of the contracts this expense was borne by the general agents.

During the taxable year the corporation had no income from any source other than as general agents. For the taxable year the corporation filed an income-tax return as a personal service corporation. The Commissioner denied the corporation classification as such and determined the deficiency in issue.

## OPINION.

PHILLIPS: Counsel for the taxpayer point out that the contracts appointing the general agents were with Hedwall and Sundberg individually, that there was no assignment thereof to the corporation, and that the corporation could not lawfully transact business as insurance agents. It is not clear whether it is the contention of counsel that because of this situation the corporation never had any income, or whether it is urged as showing that the income is to be attributed to these individuals.

It is not unusual for a corporation, for one reason or another, to enter into a contract in the name of one of its officers, employees or stockholders. Such is the case here. Although for some purposes the individuals were the general agents, the benefits of the contracts made in their names inured to the corporation, and the contracts were in fact performed through the corporation. All of the expenses of the business, including the salaries of the officers, were paid by the corporation. All of the profits went into its treasury. We can not doubt that, although the individuals still remained personally responsible, there had been such a transfer to the corporation of their interest in these contracts and such an acceptance thereof that the corporation was also a party thereto and is liable for payment of taxes upon any gains arising therefrom so long as the corporation continues to perform these contracts as its own.

Section 200 of the Revenue Act of 1918, so far as here material, defines a personal service corporation as "a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor."

There was some contention that premiums were paid by the taxpayer to the insurance companies in advance of receipt of such payments from the local agent and that capital was a material income-producing factor for that reason. Although the oral testimony was

to the effect that no payments were forwarded to the insurance company prior to remittance from the local agents, the Commissioner relied upon a material difference which existed between the accounts receivable and the accounts payable, as shown by trial balance sheets. It appears, however, that the commissions which taxpayer was entitled to receive were not segregated from these separate accounts until the close of each year, and that the difference between the accounts receivable and payable represents taxpayer's commissions, to a considerable degree.

It appears that remittances were due from the local agents forty-five days after the close of each month, while taxpayer had seventy-five days in which to make its remittance to the insurance company. The testimony is to the effect that because of this interim period the taxpayer always had on hand from $8,000 to $10,000 which was due to the fire insurance companies, and for about nine months of each year had from $50,000 to $100,000 due to the hail insurance companies. Considering all of the testimony, we are satisfied that taxpayer was not required or accustomed to make payments of premiums to the insurance companies prior to receipt from the local agents.

In addition to collecting and remitting premiums from local agents, taxpayer performed three other principal functions in the conduct of its business. It secured agents and took steps to retain their business, it accepted or rejected the insurance risk and reinsured whenever it seemed advisable so to do, and it adjusted losses. Each was an integral part in the transaction of the business, and each played its part in the production of the income. Only one of these functions was performed entirely by the stockholders. The adjustment of losses, certainly an important matter, appears to have been intrusted entirely to a company specializing in such matters. Relations with the local agents were maintained in part through the stockholders and in part through special agents in the employ of the taxpayer. In such circumstances as are disclosed by this record, after giving full credit for the important functions performed by the stockholders, their experience and standing in the business and the undisputed fact that the contracts as general agents were secured because of this experience and standing and were made with them as individuals, it nevertheless appears that the taxpayer has failed to establish the first requirement of a personal service corporation, namely, that the income shall be ascribed primarily to the activities of the principal stockholders.

*Decision will be entered for the Commissioner.*

TRUSSELL not participating.